IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

UNITED STATES OF AMERICA

v.  No. 2:19-CR-079-D

SHANE ANDREW SMITH

INFORMATION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JUN 1 2 2019

CLERK, U.S. DISTRICT COURT
By _____
Deputy

The United States Attorney Charges:

Introduction

At all times material to this Information:

1. The Reagor Dykes Auto Group (RDAG) is the informal name used to refer to a collection of legal entities with similar ownership and control.

2. In 2008, **Shane Andrew Smith** was hired to be RDAG's chief financial officer (CFO).

3. A "floor plan" is the term used to describe a loan taken out by a dealership to purchase its vehicle inventory. In 2008, Ford Motor Credit Company (FMCC) became the floor plan lender for Reagor-Dykes Motors LP (Spike Dykes Ford in Lamesa, Texas).

4. In 2014, FMCC became the floor plan lender for 1) Reagor-Dykes Auto Company LP (the Ford store in Plainview, Texas); 2) Reagor-Dykes Imports LP (the Mitsubishi store in Lubbock, Texas); and 3) Reagor-Dykes Amarillo LP (the Mitsubishi store in Amarillo, Texas).

Shane Andrew Smith
Information - Page 1

5. In 2015, FMCC became the floor plan lender for 1) Reagor-Dykes Plainview LP (the Toyota store in Plainview, Texas), and 2) Reagor-Dykes Floydada LP (the Chevrolet store in Floydada, Texas).

6. From on or about a date unknown, and continuing through on or about July 27, 2018, **Shane Andrew Smith** participated in a fraudulent floor plan fraud scheme. **Smith**, knowing that he and his co-conspirators had provided false information to FMCC, received additional financing from FMCC on behalf of RDAG or delayed paying amounts due to FMCC.

7. There were several components of the fraudulent floor plan fraud scheme, including a practice that the RDAG accounting staff referred to as "re-flooring," "fake flooring," and "dummy flooring." RDAG's staff would retrieve files from old car deals and submit the Vehicle Identification Numbers (VIN), via interstate wire communication, to FMCC as though RDAG were buying the vehicles again, when in fact it was not. An example of some of these components of the scheme were discovered in the Federal Bureau of Investigation's (FBI) review of a "wholesale statement" for Reagor-Dykes Amarillo LP for the billing period July 1, 2018, to July 31, 2018, which shows the July 2018 activity on the Amarillo dealership's floor plan loan. FBI agents examined six vehicles from that statement that Reagor-Dykes Amarillo LP floored with FMCC. These six vehicles were all floored in early July 2018, which was soon after the late June 2018 floor plan audit. The table below shows the vehicle, when the vehicle was floored with FMCC, and the amount that FMCC advanced to Reagor-Dykes Amarillo LP for

each vehicle:

| VIN | Year & make | Floor date | Amount |
|---|---|---|---|
| XXXXXXXC3FR117711 | 2015 Chevrolet | 7/9/2018 | 36,475.00 |
| XXXXXXXG5FL500364 | 2015 Jeep | 7/9/2018 | 30,325.00 |
| XXXXXXXT3ES104515 | 2014 Dodge | 7/2/2018 | 21,350.00 |
| XXXXXXX84GGA19806 | 2016 Ford | 7/3/2018 | 27,350.00 |
| XXXXXXXF0FKD78551 | 2015 Ford | 7/2/2018 | 38,325.00 |
| XXXXXXX66G5601409 | 2016 Chevrolet | 7/9/2018 | 63,350.00 |

Records for IBC account XXXXXXX 846 titled "Reagor-Dykes Amarillo LP" show electronic deposits from FMCC all throughout July 2018. They show up on the statements as "FORD CREDIT DEFT CREDIT." DEFT is the acronym for FMCC's Dealer Electronic Funds Transfer system. These funds were transferred via wire in interstate commerce.

FBI agents learned that the registration information as of March 27, 2019, showed that these same six vehicles were all bought and sold by the Amarillo dealership months before RDAG flooring them with FMCC in July 2018. The current registered owners bought these vehicles from Reagor-Dykes Amarillo LP between February 2017 and April 2018. The registration information shows that the previous owner on all six vehicles is "Reagor Dykes, Amarillo, TX." These are six examples of RDAG submitting fraudulent flooring requests to FMCC and would be what RDAG's accounting staff describes as "re-flooring" or "dummy flooring."

The actual loss amount for the floor plan fraud is approximately $27,019,211.02. This amount is based on the following:

Shane Andrew Smith
Information - Page 3

a) $13,844,522.70–409 vehicles not in inventory,

b) $11,616,703.66–352 vehicles sold by RDAG and funded, and

c) $1,558,484.66–37 vehicles re-floored.

8. "Check kiting" is a systematic scheme to defraud, whereby nonsufficient checks are traded or cross-deposited between two or more checking accounts in order to artificially inflate the bank account balances. This is accomplished by using the float time in the bank system. Once bank accounts are artificially inflated, checks that would normally be returned for nonsufficient funds are, in fact, paid or honored by the issuing banks. From on or about a date unknown, and continuing through on or about July 27, 2018, **Smith** participated in a fraudulent check kiting scheme with several banks. **Smith**, knowing that the banks had been falsely informed, received money or credit from the banks for RDAG.

## Count One
## Conspiracy to Commit Wire Fraud
## (Violation of 18 U.S.C. § 1349)

9. The Introduction of this Information is re-alleged and incorporated as though fully set out in this Count One.

10. Beginning on or about a date unknown and continuing until on or about July 27, 2018, in the Amarillo Division of the Northern District of Texas, and elsewhere, **Shane Andrew Smith**, defendant, did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with others, known and unknown to the United States, to knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false representations and pretenses, and, for the purpose of executing such scheme and artifice to defraud and for obtaining money and property by means of materially false representations and pretenses, transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## Purpose of the Conspiracy

11. **Smith** and his co-conspirators did knowingly and with intent to defraud, devise, intend to devise, and participate in a scheme to unlawfully enrich RDAG by deceiving FMCC and fraudulently inducing it to send money to RDAG and concealing this fraud by use of a check-kiting scheme.

## Manner and Means of the Conspiracy

The manner and means by which **Smith** and his co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following:

12. **Smith** and his co-conspirators employed materially false representations and pretenses for the purpose of executing the scheme and artifice to defraud, that is, they transmitted and caused to be transmitted fraudulent wire information to FMCC to delay paying amounts due to FMCC and to obtain additional financing from FMCC. RDAG would receive money by means of wire communications in interstate and foreign commerce.

13. **Smith** and his co-conspirators employed materially false representations and pretenses for the purpose of executing the scheme and artifice to defraud, that is, they participated in an extensive check kiting scheme in order to perpetuate the floor plan scheme and defraud FMCC.

## The Scheme and Artifice to Defraud

14. When FMCC had previously extended floor plan loan proceeds to RDAG to purchase a vehicle, RDAG had seven business days to repay FMCC after the sale of that vehicle. **Smith** and the RDAG accounting staff routinely and intentionally failed to make those payoffs, which is referred to as "selling vehicles out of trust."

15. FMCC conducted what were supposed to be surprised audits. However, RDAG would learn in advance the exact date when FMCC's quarterly floor plan audits were going to take place, and RDAG would disseminate that information to its controllers

or office managers in the dealerships.

16. RDAG controllers and office managers, with the help of their office staff, would prepare for the floor plan audits by creating false paperwork, sometimes referred to as "dummy shucks," on vehicles that were sold out of trust, in order to make it appear as though the vehicles had just recently sold and were not out of trust. Specifically, RDAG accounting staff would falsify sale dates.

17. When the FMCC-contracted auditors from Alliance Inspection Management LLC (AIM) would arrive on site at RDAG dealerships to conduct the floor plan audits, the RDAG controllers or office managers would provide the aforementioned false paperwork, or dummy shucks, to the auditors. This gave the appearance that RDAG was not selling vehicles out trust, and thus RDAG was passing its audits.

18. The net effect of the overt acts described above was that RDAG would owe FMCC larger-than-usual floor plan payment for the seven-day period immediately following audits because of the misrepresentations that large numbers of vehicles had purportedly been sold in the days just prior to the audit. Therefore, RDAG kited intercompany checks to falsely inflate its account balances in order to make the large payments due to FMCC.

19. RDAG accounting staff would submit false information by interstate wire communication to FMCC in order to acquire new floor plan funding, which was then applied toward the large payoffs to FMCC after each audit.

20. RDAG accounting staff would submit requests by interstate wire

communication to FMCC for new floor plan funding for vehicles that had already passed through the dealerships months or years before.

21. RDAG staff would retrieve files from old car deals and submit the Vehicle Identification Numbers (VIN) to FMCC as though RDAG were buying the vehicles again, when in fact it was not. RDAG accounting staff referred to this practice as "re-flooring," "fake flooring," or "dummy flooring."

22. Once RDAG made the large post-audit payoffs to FMCC using kited funds, dummy flooring proceeds, and revenue generated from normal operations; RDAG accounting staff would then prioritize paying off the dummy flooring with the subsequent revenue generated from normal operations. In doing so, the subsequent revenue was not available, within the agreed seven-day payoff window, to pay off the floor plan advances associated with the actual vehicles that RDAG sold to generate that subsequent revenue. Consequently, those vehicles were out of trust, and the whole cycle of overt acts started all over again.

23. It was part of the scheme and artifice to defraud that RDAG's accounting staff sent a list of inventory from one RDAG dealership that was floored with another lender to another RDAG dealership to be floored with FMCC. That is, RDAG dealerships would obtain two loans for the same vehicle and the same vehicle would be pledged as collateral to both lenders. RDAG's office staff referred to this as "double flooring."

24. **Smith** and his co-conspirators electronically transmitted via interstate wire communication fraudulent flooring request from RDAG's locations in Texas to FMCC in Michigan.

All in violation of Title 18, United States Code, Section 1349.


ERIN NEALY COX
UNITED STATES ATTORNEY

_/s/ Joshua Frausto_

JOSHUA FRAUSTO
Assistant United States Attorney
West Texas Deputy Branch Chief
Texas State Bar Number 24074228
500 South Taylor Street, Suite 300
Amarillo, Texas 79101-2446
Telephone:   806-324-2356
Facsimile:   806-324-2399
E-mail:       joshua.frausto@usdoj.gov